IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BERNARD B.,[1]

       Plaintiff,

v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

       Defendant.

Case No. 3:22-CV-00558-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Bernard B. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is affirmed.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on March 7, 2019, alleging an onset date of April 15, 2007. (Tr. 428-34, 466). Plaintiff based his claim on his major depressive disorder. (Tr. 23). The application was initially denied on April 29, 2019. (Tr. 247-50). Plaintiff's timely request for reconsideration was also denied on July 17, 2019. (Tr. 251, 253-55). Plaintiff requested a hearing, and Administrative Law Judge ("ALJ") Katherine Jecklin held a hearing on June 30, 2021, at which Plaintiff, his attorney, and a vocational expert appeared. (Tr. 174-212, 256-57).

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

The ALJ issued an unfavorable decision on September 13, 2021, finding that Plaintiff was not disabled because he had the residual functional capacity ("RFC") to perform work at all exertional levels with limitations to address his mental impairment and could perform a significant number of jobs in the national economy under sections 216(i) and 223(d) of the Social Security Act. (Tr. 15-39). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 6-11).

Plaintiff now appeals that decision directly to this Court, raising two points: (1) the ALJ's report is conclusory without adequate explanation of how the evidence of record supports the RFC finding, and (2) the ALJ failed to properly evaluate opinion evidence. (Doc. 19). The Commissioner timely filed a brief in opposition. (Doc. 28).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The scope of review is limited and, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the entire administrative record is taken into consideration, but the reviewing court may not "reweigh the evidence, resolve debatable

evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination[.]" *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). When an ALJ ignores an entire line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Ignoring evidence in this way requires the district court to remand to the agency. *Golembiewski*, 322 F.3d at 917.

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for *any* consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)) (emphasis in original).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by medically acceptable

diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that is both substantial and gainful involving performing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

To render a decision after a Social Security hearing, an ALJ considers five questions in determining whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him or her unable to perform his or her past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Milhem v. Kijakazi,* 52 F.4th 688, 691 (7th Cir. 2022).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

I.       **Evidentiary Hearing**

Plaintiff appeared via telephone and was represented by counsel at the hearing on June 30, 2021. (Tr. 18, 174-212). Vocational expert Vanessa May also testified by telephone. (*Id.*).

Plaintiff testified that he has a high school education and has worked as a security guard and an airport shuttle bus driver. (Tr. 184, 202). Initially, he reported the primary reason for his inability to work as his bad back, bad knees, high blood pressure, and diabetes. (Tr. 186). He stated, however, that he did not receive treatment for these conditions until around 2016, long after the relevant period for his claim of April 2007 to December 2012. (Tr. 186-87). Plaintiff also expressed that his physical conditions would not cause issues within a sedentary or seated job. (Tr. 196). Eventually, Plaintiff testified that he suffered from depression during the relevant window and that he saw a psychiatrist for this condition. (Tr. 191-92). He explained to his psychiatrist that he often felt low, down on his luck, and unwell, and that he had bad thoughts. (Tr. 192). To address these symptoms, the psychiatrist prescribed medication that occasionally caused dizziness. (*Id.*; Tr. 194).

As to his daily life during the relevant time, Plaintiff reported that he was not very active and that he "did the best [he] could" to maintain his hygiene. (Tr. 193). When asked what he did in a typical day, he stated, "Basically, you know, nothing." (*Id.*). Plaintiff explained that his mother helped him around the house especially with purchasing items he needed from the store. (*Id.*). He also testified that he struggled to concentrate for periods of time and experienced instances when he could not think clearly. (*Id.*).

In some of Plaintiff's responses, he struggled to recall—or perhaps to clearly assess and articulate—his abilities during the relevant time period. When asked whether he believed, in light of his mental health, he could concentrate for eight hours at a time, Plaintiff answered, "I couldn't tell you that." (Tr. 194). Similarly, when asked if he would have encountered problems dealing with supervisors or coworkers at a job, Plaintiff responded, "I do the best I can." (*Id.*). He gave exactly the same response when asked if he would be able to attend a job five days a week for eight hours a day. (Tr. 197). Upon more questioning about whether he could get along with others during an eight-hour period for five days a week, Plaintiff remained unsure and mentioned that he could try and take medicine. (Tr. 194-95). After hearing the question about issues working with a supervisor or coworkers on a daily basis for the third time, Plaintiff conceded, "No, I don't think I would've had any problems." (Tr. 195). As to his ability to remember how to do his assigned job tasks at the relevant time, Plaintiff stated, "I would do the best I could." (*Id.*). He later clarified that he was not sure. (*Id.*).

Plaintiff reported no drug or alcohol issues. (*Id.*). Due to his financial circumstances, he did not have access to health insurance but would have sought more frequent treatment if he did. (Tr. 196). He reported that he experienced good days and bad days at that time. (Tr. 198). During the relevant time period, Plaintiff aged from 40 years old to 46 years old and lived with his mother. (Tr. 181-82, 197, 198). At the time of the hearing, he still resided with his mother. (Tr. 198). He helped around the house through trimming and mowing the yard, vacuuming, sweeping, mopping, tidying, and cleaning. (Tr. 199-200). After about half an hour of work, he would pause for a break before

resuming a task. (*Id.*). Plaintiff could not firmly recall how long he could engage in these activities, but settled on, "a few hours." (Tr. 200). Outside of the house, Plaintiff did not drive during the relevant time period because of his physical limitations. (Tr. 200-01).

Vanessa May, the vocational expert, testified that Plaintiff's past roles, a shuttle bus driver and security guard, were both classified as semiskilled. (Tr. 202). May testified that an individual with Plaintiff's limitations would not be able to perform his past work, but that such an individual could perform other medium, unskilled jobs such as a janitor, landscape laborer, or a kitchen helper. (Tr. 203). May testified, however, if the individual was off-task more than fifteen percent of the time, then employment in these roles would be difficult to maintain. (Tr. 204).

## II.      Relevant Medical Records

Plaintiff first saw Syed Raza, M.D., a psychiatrist, for his mental health concerns in November 2009. (Tr. 569-70, 594-95). Dr. Raza observed that Plaintiff presented casually dressed, unkempt, coherent, and alert. (*Id.*). In this initial visit, Plaintiff reported depressed mood, crying spells, social withdrawal, anhedonia, hopelessness, helplessness, worthlessness, guilt for missed opportunities, fatigue, irritable mood, distractibility, forgetfulness, decreased sleep, decreased appetite, decreased sex drive, and instances of hearing voices. (*Id.*). These symptoms started two years prior. (*Id.*). In this appointment, Dr. Raza characterized Plaintiff's speech as slurred and mumbling and Plaintiff's insight or judgment as limited. (*Id.*). Plaintiff appeared irritated by the routine evaluation questions. (*Id.*). He could name two of five recent past presidents, three of five large cities, and correctly identify a course of action upon finding a stamped, addressed envelope—

giving it to a mailman. (*Id.*). Plaintiff failed to count backwards from 100 in increments of 7. (*Id.*). Dr. Raza diagnosed Plaintiff with major depressive disorder and prescribed Geodon and Lexapro. (*Id.*).

Throughout the next year, Dr. Raza followed up with Plaintiff about every two months. (Tr. 571-74, 596-99, 603-14, 616-27). Early on, Dr. Raza recorded that Plaintiff could manage his own funds. (Tr. 573). Moreover, at that time, Dr. Raza documented that Plaintiff suffered no serious limitations in the following areas: the completion of household duties (cooking, grocery shopping, paying bills, and taking care of himself); independent public transportation; the ability to initiate, sustain, or complete tasks; the ability to understand, carry out, and remember instructions on a sustained basis; performing tasks on an autonomous basis without direct step-by-step supervision and direction; and performing tasks on a sustained basis without undue interruptions or distractions. (Tr. 573-74). Dr. Raza reported serious limitations with the ability to respond appropriately to supervision, coworkers, and customary work pressures. (*Id.*).

In each visit, Dr. Raza made similar observations of Plaintiff's casual attire, irritable mood, alert orientation, general coherence, and limited insight/judgment. (Tr. 571-74, 596-99, 603-14, 616-27). Dr. Raza also noted, on multiple occasions, that Plaintiff held poor eye contact, had extraordinary difficulty putting his feelings into words, experienced great difficulty communicating and interacting, lacked self-confidence, presented tense posture, maintained disheveled hygiene, mumbled, heard voices, and showed slight improvement. (*Id.*). Throughout their visits, Plaintiff reported persistent sad feelings and anxiety. (*Id.*). Dr. Raza's treatment notes indicated fluctuating

effect of medications on the target symptoms. (*Id.*).

In early 2010, Dr. Raza continued Plaintiff's current medication regimen, slightly upping the dosage of Geodon, reporting a less than optimal response to treatment. (Tr. 573, 601). In December 2010, Dr. Raza added Cymbalta to Plaintiff's ongoing regimen (Tr. 608, 621). Just two months later, Dr. Raza overhauled Plaintiff's regimen by swapping the old medications with Prozac, Citalopram, and Risperdal. (Tr. 606, 619). The last visit between Plaintiff and Dr. Raza documented in the record occurred in August 2011. (Tr. 603-04, 616-17). At that time, Dr. Raza noted Plaintiff's stable mood, his report of feeling better, and a lack of significant complaints. (Tr. 603, 616). Dr. Raza listed the medication's effect on target symptoms as adequate and decided to continue the same regimen. (Tr. 604, 617).

## III.    State Agency Examiners

Turning back to March 2010, a state agency consultant, Lionel Hudspeth, Psy.D., reviewed Dr. Raza's initial patient notes for Plaintiff. (Tr. 576-89, 590-92). Dr. Hudspeth opined that Plaintiff exhibited mild restriction in activities of daily living, mild limits in maintaining social functioning, and moderate limits in maintaining concentration, persistence, or pace. (Tr. 586). Further, Dr. Hudspeth assessed that Plaintiff was not significantly limited in a variety of categories included in the Mental Functional Capacity Assessment. (Tr. 590-91). But he identified four areas that Plaintiff suffered moderate limitation: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to accept instructions and respond

appropriately to criticism from supervisors; and the ability to set realistic goals or make plans independently of others. (*Id.*). At the end of his review, Dr. Hudspeth noted that the records indicated intact cognition, memory, and thought processing skills sufficient for at least two to three step tasks. (Tr. 592). Dr. Hudspeth did not identify any significant social or behavioral impediments to the work environment, any significant issues with Plaintiff's ability to adapt to a work environment, or any significant issues with Plaintiff's ability to learn a route to a worksite. (*Id.*).

Four other state agency examiners, David Voss, Ph.D., Lenore Gonzalez, M.D., M.W. DiFonso, Psy.D., and Frank Mikell, M.D., reviewed Plaintiff's records from January 2012 to December 2012. (Tr. 231-45). Each examiner noted that the prior ALJ decision controlled the period between the alleged onset date until January 2012. (Tr. 232-33, 241-42). Reviewing the record at the initial level, Dr. Voss found insufficient evidence to evaluate the claim. (Tr. 233). Upon review of Plaintiff's medical records, statements, and how his condition affected his work, Dr. Gonzalez determined that Plaintiff's condition was not disabling. (Tr. 234-36). At the reconsideration level, Dr. Mikell and Dr. DiFonso also denied the claim for insufficient evidence. (Tr. 241-43).

### DECISION OF THE ALJ

In reaching her decision, the ALJ considered the hearing, including testimony from Plaintiff and the impartial vocational expert. She also considered Plaintiff's medical records and the opinions of Dr. Raza, Dr. Hudspeth, Dr. Voss, Dr. Gonzalez, Dr. DiFonso, and Dr. Mikell.

At step one, the ALJ concluded that Plaintiff did not engage in substantial gainful

activity from April 15, 2007, to December 31, 2012. (Tr. 23). At step two, the ALJ determined that Plaintiff's major depressive disorder constituted a severe impairment. (*Id.*). At step three, the ALJ found that Plaintiff's impairment did not meet or medically equal the severity of one of the impairments listed in the regulations. (*Id.*). Specifically, the ALJ noted that the record, at most, demonstrates moderate impairment in some of the broad areas of functioning (understanding, remembering, applying information, interacting with others, concentrating, persisting, maintaining pace, and adapting or managing himself). (Tr. 24). Further, the ALJ found that Plaintiff's mental impairments persisted for over two years, but the record failed to show that he relied on medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish the symptoms of his mental impairment and that he only achieved marginal adjustment. (Tr. 25-26).

At step four, the ALJ determined that Plaintiff is unable to perform his past relevant work as a shuttle bus driver or security guard, as those jobs are considered medium and light exertion, respectively, and both are semi-skilled activities. (Tr. 31). The ALJ relied on the vocational expert's testimony that a person with Plaintiff's RFC would not be able to perform this job. (*Id.*).

Finally, at step five, the ALJ concluded that Plaintiff had the RFC to perform unskilled work, with the following non-exertional limitations: (1) Plaintiff could maintain the attention required to perform simple, routine tasks and make simple, work-related decisions; (2) Plaintiff could perform work that was not at a fast pace such as on an assembly line, but could stay on task and meet reasonable production requirements in an

environment that allowed a flexible and goal-oriented pace; (3) He could have occasional

interations with co-workers and the public. (Tr. 32-33). In making this finding, the ALJ

considered Plaintiff's testimony regarding his symptoms and found that his medically

determinable impairments could reasonably be expected to cause the alleged symptoms.

(Tr. 27). The ALJ concluded, however, that Plaintiff's statements concerning the intensity,

persistence and limiting effects of his symptoms were not entirely consistent with the

medical evidence and other evidence in the record. (*Id.*). Based on the testimony of the

vocational expert, the ALJ concluded that, "considering [Plaintiff's] age, education, work

experience, and residual functional capacity, [Plaintiff] was capable of making a

successful adjustment to other work that existed in significant numbers in the national

economy." (Tr. 32).

Considering all of the above, the ALJ found Plaintiff was not under a disability, as

defined in the Social Security Act, from April 15, 2007, through December 31, 2012.

(Tr. 32-33).

## DISCUSSION

I.   **Was the ALJ's RFC finding supported by substantial evidence and adequately explained?**

Plaintiff argues that the ALJ failed to logically connect the evidence to her

conclusion. For example, Plaintiff criticizes this statement: "though the record does reflect

some issues with irritability and unkempt appearance, it also shows that the claimant's

conservative treatment was sufficient to stabilize his mood. Therefore, the record as a

whole supports the RFC in finding five." According to Plaintiff, the ALJ failed to clearly

Page 12 of 20

identify the evidence relied upon in making this conclusion and failed to address how symptoms of irritability and unkempt appearance would affect Plaintiff's ability to function in a workplace. The ALJ found support for the notion that Plaintiff was capable of maintaining the attention required to perform simple, routine, tasks, and make simple, work-related decisions, despite his complaints of impaired concentration, because he lived with his mother and performed chores with only conservative mental health treatment. Plaintiff points to this finding as another example that the ALJ failed to logically connect the evidence to her conclusion.

In visits with Plaintiff, Dr. Raza repeatedly documented other symptoms like limited insight and judgment, poor eye contact, mumbled speech, crying spells, anxiety, negative thoughts, and difficulty communicating. Plaintiff contends that the ALJ ignored these symptoms and only summarized the office visits referencing the parts of treatment notes that support the RFC finding without other portions of the record. Plaintiff also argues that the ALJ's decision relied too heavily on Plaintiff's own vague testimony, that the ALJ limited during the hearing.

The ALJ concluded that Plaintiff had the RFC to perform a full range of work at all exertional levels but with a number of non-exertional limitations to address the symptoms of his mental impairment. She found that Plaintiff could maintain the attention required for simple, routine tasks and make simple, work-related decisions. Moreover, he could perform work that was not at a fast pace, but could stay on task and meet reasonable production requirements in an environment that allowed a flexible, goal-oriented pace. She also decided that Plaintiff could occasionally interact with coworkers,

supervisors, and the public.

The RFC assessment is supported by substantial evidence. Plaintiff's subjective complaints, his testimony, Dr. Raza's treatment notes, and the medical opinion evidence all support the ALJ's conclusion that Plaintiff could perform simple, routine work with limited, simple decision-making, and occasional interactions with others.

While Plaintiff argues that the ALJ embraced only supporting evidence, Plaintiff himself ignores his own testimony. He testified to his ability to mow and trim the lawn, mop, vacuum, sweep, clean the house with occasional breaks but no overall limit to the length of time he could perform these tasks. He estimated that he could perform these tasks for at least a few hours at a time. During his testimony, Plaintiff also focused on his physical limitations as the primary inhibitor of his abilities, rather than his mental health—the only medically determinable condition for the ALJ's review. In his arguments, Plaintiff also ignores that Dr. Raza identified only one work-related functioning limitation in the ability to respond appropriately to supervision, coworkers, and customary work pressures due to lack of self-confidence. Dr. Raza found no other serious limitation with Plaintiff's ability to: independently initiate, sustain, or complete tasks; understand, carry out, and remember instructions; perform tasks autonomously without step-by-step supervision and direction; or perform tasks on a sustained basis without undue interruptions or distractions. Plaintiff also testified that, during the relevant time, he does not think he would have struggled to work with supervisors or other people on a daily basis. The findings of Plaintiff's own treating psychiatrist, paired with Plaintiff's testimony, support the ALJ's RFC finding and the outlined limitations.

The ALJ also addressed many of the symptoms Plaintiff accuses her of ignoring. In assessing the severity of Plaintiff's mental impairment and limitations, the ALJ discussed Plaintiff's personal hygiene and that Dr. Raza routinely characterized him as unkempt, but weighed that against the frequent notes of his casual and appropriate dress. Moreover, the ALJ noted that Plaintiff appeared irritated by routine evaluation and follow-up questions, but found that Plaintiff's mood stabilized with a different set of medications, and Dr. Raza did not record irritation in his later treatment notes. In rendering a decision, the ALJ also considered other symptoms like Plaintiff's mumbling and inability to articulate his feelings, as well as his limited judgment and insight. The ALJ weighed this against Dr. Raza's notes that Plaintiff consistently appeared alert, oriented, and coherent, discussed relevant topics, and engaged in abstract thinking. This is different from a situation where the ALJ impermissibly "ignore[s] an entire line of evidence that supported a finding of disability[.]" *Jones v. Astrue,* 623 F.3d 1155, 1162 (7th Cir. 2010).

As to Plaintiff's arguments that the ALJ failed to logically connect the evidence to her conclusions, the Court also disagrees. The ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled[.]" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Here, the ALJ summarized all the relevant evidence including medical records, testimony, and state agency examiner findings. In the summaries, the ALJ noted all of Plaintiff's reported symptoms within Dr. Raza's documentation and addressed those symptoms in light of the bigger picture. Plaintiff's treatment spanned from November 2009 to August 2011, with recorded fluctuation in his

mental health and related symptoms. Dr. Raza implemented conservative treatment of prescription medication and follow-up visits every two months, and, with time, Plaintiff's symptoms improved. Dr. Raza noted that Plaintiff adequately responded to the medication adjustment during his treatment. The ALJ discussed how she balanced each symptom in comparison to the other present and reported symptoms. For example, she balanced reports that Plaintiff mumbled and struggled to express himself with reports that he remained alert and oriented, applied for jobs, and described his depression as "not so bad." The ALJ also clearly explained why Plaintiff's activities of daily living undermined Plaintiff's testimony regarding his concentration problems. Plaintiff testified that he could perform household tasks for several hours at a time with intermittent breaks. The ALJ did not err in finding that his testimony regarding daily activities undercut his other testimony regarding concentration, especially considering that the medical records confirmed his ability to think abstractly, remember current events, and recount medical history.

The ALJ also provided Plaintiff the "maximum benefit of the doubt" in finding a moderate, as opposed to mild, limitation in concentration, persisting, and maintaining pace even though his own treating psychiatrist found no serious limitation in that area. In doing so, she assessed Plaintiff's testimony that he struggled to think clearly and was unsure about his ability to concentrate for two hours a day, along with his testimony about performing household tasks and the treatment notes demonstrating his coherence and alertness. The ALJ reasonably weighed this evidence and logically connected her assessment of the evidence to her conclusions.

**II.     Did the ALJ properly evaluate opinion evidence?**

Plaintiff argues that the ALJ improperly evaluated the medical opinions in the record because she failed to articulate how she considered the factors of supportability and consistency in determining persuasiveness. Moreover, Plaintiff contends that the ALJ's evaluation of the medical opinion evidence lacks any citation to actual findings in the record that support or are consistent with the opinions.

While an ALJ must consider opinions offered by medical experts, she is not bound by those opinions, but rather evaluates them in the context of the expert's medical specialty and expertise, supporting evidence in the record, and other explanations regarding the opinion. *Haynes v. Barnhart,* 416 F.3d 621, 630 (7th Cir. 2005). The ALJ must "consider the supportability of the opinion, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program physician or psychologist." *Id.* When the record contains well-supported evidence contradictory to a treating physician's opinion, that opinion is just one more piece of evidence for the ALJ to weigh. *Hofslien v. Barnhart*, 439 F.3d 375, 376-77 (7th Cir. 2006). Under the very deferential standard, an ALJ must minimally articulate her reasons for discounting a physician's opinion after considering the relevant factors in the Social Security regulations. *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008).

Here, the ALJ considered the objective medical opinion evidence for the alleged disability period, using the relevant factors in 20 C.F.R. § 404.1520c, including Dr. Raza's evaluation, Dr. Hudspeth's assessment, and the reports of the state agency examiners.

Page 17 of 20

As to Dr. Raza's evaluation from February 2010, the ALJ mostly found the assessment persuasive. She incorporated many of Dr. Raza's observations into her limitation analysis, even escalating some limitations to a moderate level based on Plaintiff's testimony. The ALJ explained that she gave partial weight to Raza's opinion that Plaintiff had a serious limitation interacting with supervisors and coworkers, because Plaintiff testified to the contrary and Plaintiff showed improvement within the subsequent year. The ALJ's finding is supported by the record and contains adequate reasons for the persuasiveness of Dr. Raza's treatment notes.

Likewise, the ALJ considered the assessment of Dr. Hudspeth, a state agency reviewing physician who evaluated Plaintiff's medical records in March 2010. Dr. Hudspeth indicated that Plaintiff had mild limitations in activities of daily living and maintaining social functioning, along with a moderate limitation in the broad functional area of concentrating, persisting, or maintaining pace. In a written explanation, Dr. Hudspeth opined that Plaintiff had intact cognition, memory, and thought processing skills that could allow him to perform at least two to three step tasks. He found no documentation of significant social or behavioral impediments in the work environment or any significant issues with Plaintiff's ability to adapt to a workplace. Overall, the ALJ found Dr. Hudspeth's opinion partially persuasive. She found his conclusions generally supported and consistent with the medical evidence in the record. The only unpersuasive finding related to interaction with supervisors, which the ALJ explained she discounted due to Plaintiff's own contrary testimony. Plaintiff emphasizes that Dr. Hudspeth reviewed the record after only the first visit with Dr. Raza. While Plaintiff received more

treatment after Dr. Hudspeth's review, the record indicates Plaintiff's symptoms did not substantially change or worsen, rather, in some respects, he showed improvement. In any event, this evaluation can still be considered by the ALJ especially when viewed as one part of the record as a whole.

Lastly, the ALJ discussed the evaluations of the state agency examiners, Dr. Voss, Dr. Gonzalez, Dr. DiFonso, and Dr. Mikell. Each of these examiners cited insufficient evidence to determine physical limitations. The ALJ found these conclusions persuasive because they were consistent with the complete lack of medical records demonstrating any treatment of Plaintiff's *physical* limitations. While his treating physician noted Plaintiff's obesity, the records lacked any indication that such condition impacted Plaintiff's work-related activities. The state agency examiners also found insufficient evidence regarding mental limitations. Because of Dr. Raza's treatment notes, the ALJ regarded that conclusion as unpersuasive. Again, the ALJ explained that the record contained evidence that Plaintiff's major depressive disorder was a severe mental condition that created limitations for Plaintiff in work-related activity. The ALJ's analysis of these evaluations adequately explains the supportability and consistency of these non-treating, non-examining medical source opinions. Not to mention, the ALJ's ultimate RFC finding contained more limitations than the state agency examiners identified.

The ALJ properly articulated her reasons in assessing each medical source opinion and evaluation. In doing so, she provided insight into the supportability and consistency of each opinion. The ALJ did not err in her evaluation of the medical source opinions.

CONCLUSION

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice.**

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:    September 25, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**